## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ANDERSON HOSPITAL**
6800 State Route 162
Maryville, IL  62062

**ASPIRUS RIVERVIEW HOSPITAL**
410 Dewey Street
Wisconsin Rapids, WI  54494

**AULTMAN HOSPITAL**
2600 Sixth Street Southwest
Canton, OH  44710

**BRYAN MEDICAL CENTER**
1600 South 48th Street
Lincoln, NE  68506

**CALDWELL MEMORIAL HOSPITAL**
321 Mulberry Street, Southwest
Lenoir, NC  28645

**CARLE FOUNDATION HOSPITAL**
611 West Park Street
Urbana, IL  61801

**ELKHART GENERAL HOSPITAL**
600 East Boulevard
Elkhart, IN  46514

**ESKENAZI HEALTH**
720 Eskenazi Avenue
Indianapolis, IN  46202

**FRANCISCAN HEALTH INDIANAPOLIS**
8111 South Emerson Avenue
Indianapolis, IN  46237

**GOOD SAMARITAN HOSPITAL**
520 South Seventh Street
Vincennes, IN  47591

**GREAT RIVER MEDICAL CENTER**
1221 South Gear Avenue
West Burlington, IA  52655

Case No. _____

**COMPLAINT
FOR JUDICIAL REVIEW,
DECLARATORY JUDGMENT,
AND MANDAMUS RELIEF**

**HANCOCK REGIONAL HOSPITAL**
801 North State Street
Greenfield, IN  46140

**HENRY COMMUNITY HEALTH**
1000 North 16th Street
New Castle, IN  47362

**INDIANA UNIVERSITY HEALTH**
1701 North Senate Blvd
Indianapolis, IN  46202

**MARION GENERAL HOSPITAL**
441 North Wabash Avenue
Marion, IN  46952

**MAYO CLINIC HEALTH SYSTEM
IN EAU CLAIRE**
1221 Whipple Street
Eau Claire, WI  54703

**MAYO CLINIC HEALTH SYSTEM -
FRANCISCAN HEALTHCARE IN LA CROSSE**
700 West Avenue South
La Crosse, WI  54601

**MEMORIAL HEALTHCARE**
826 West King Street
Owosso, MI  48867

**MEMORIAL HOSPITAL**
615 North Michigan Street
South Bend, IN  46601

**METHODIST HOSPITAL**
1305 North Elm Street
Henderson, KY  42420

**MHP MEDICAL CENTER**
2451 Intelliplex Drive
Shelbyville, IN  46176

**NORTHSIDE HOSPITAL GWINNETT**
1000 Medical Center Boulevard
Lawrenceville, GA  30046

**NORTON HOSPITALS, INC.**
200 East Chestnut Street
Louisville, KY  40202

**PARKLAND HOSPITAL**
5200 Harry Hines Boulevard
Dallas, TX  75235

**PIH HEALTH GOOD SAMARITAN HOSPITAL**
1225 Wilshire Boulevard
Los Angeles, CA  90017

**PRISMA HEALTH BAPTIST HOSPITAL**
Taylor at Marion Streets
Columbia, SC  29220

**RMC ANNISTON**
400 East Tenth Street
Anniston, AL  36202

**SAINT TAMMANY PARISH HOSPITAL**
1202 South Tyler Street
Covington, LA  70433

**ST. BERNARDS MEDICAL CENTER**
225 East Jackson
Jonesboro, AR  72401

**STONEWALL JACKSON MEMORIAL
HOSPITAL**
230 Hospital Plaza
Weston, WV  26452

**UNION HOSPITAL**
1606 North Seventh Street
Terre Haute, IN  47804

**UNIVERSITY HEALTH
LAKEWOOD MEDICAL CENTER**
7900 Lee's Summit Road
Kansas City, MO  64139

**UNIVERSITY HEALTH
TRUMAN MEDICAL CENTER**
2301 Holmes Street
Kansas City, MO  64108

**UNIVERSITY OF IOWA**
**HOSPITALS & CLINICS**
200 Hawkins Drive
Iowa City, IA  52242

**UNIVERSITY OF TOLEDO MEDICAL CENTER**
3000 Arlington Avenue
Toledo, OH  43614

**WEIRTON MEDICAL CENTER**
601 Colliers Way
Weirton, WV  26062

**WOOSTER COMMUNITY HOSPITAL**
1761 Beall Avenue
Wooster, OH  44691
     Plaintiffs,

v.

**XAVIER BECERRA**, Secretary of the United States
Department of Health and Human Services
Room 700-E
200 Independence Avenue, S.W.
Washington, D.C. 20201

    Defendant.

## COMPLAINT FOR JUDICIAL REVIEW, DECLARATORY JUDGMENT, AND MANDAMUS RELIEF

1.    The above-captioned 37 Plaintiff hospitals (hereinafter "Plaintiffs" or "Providers"), by and through their undersigned counsel, bring this action against Defendant Xavier Becerra in his official capacity as the Secretary ("Secretary") of the United States Department of Health and Human Services ("HHS"), and state as follows:

## NATURE OF ACTION

2.    This is an action for judicial review, pursuant to 42 U.S.C. § 1395oo(f)(1), of a final decision of the Secretary finding that the Provider Reimbursement Review Board ("PRRB" or "Board") is without authority to review the Plaintiffs' challenges to the calculation of their

Medicare disproportionate share hospital ("DSH") adjustments for the services they furnished to low-income patients in fiscal years 2009 through 2017. The final administrative decisions in response to the Plaintiffs' requests for expedited judicial review ("EJR Determinations") are attached hereto as **Exhibits 1, 2, and 3**, and are incorporated herein by reference. The EJR Determinations acknowledged the Plaintiffs' right to seek judicial review in this matter.

3.    The Plaintiffs maintain that their DSH reimbursement calculations were understated due to the failure of the Centers for Medicare and Medicaid Services ("CMS") and the relevant Medicare Administrative Contractors ("MAC" or "contractor") to include in the numerator of the Medicare fraction of the Medicare DSH calculation all patient days for patients who were eligible for and enrolled in the SSI program but may not have received an SSI payment for the month in which they received services (hereinafter "SSI Enrollees"),  as required by 42 U.S.C. § 1395ww(d)(5)(F) (the "DSH statute").

4.    In enacting the statute, Congress intended the Medicare DSH payment to compensate hospitals, like the Plaintiffs in the instant case, that shoulder the financial burden of providing care to a disproportionate number of low-income patients. It is based on a proxy measure for a hospital's low-income patient utilization which is the sum of two fractions expressed as a percentage. *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi); 42 C.F.R. § 412.106(b).

5.    In filings submitted to the PRRB, the Secretary's administrative tribunal, the Plaintiffs established that the Secretary used a legally flawed method to count the patient days included in the numerator of the Providers' respective Medicare fractions (hereinafter "SSI Days").

6.    As the DSH statute is currently construed by the Secretary, a hospital patient is "entitled" to Medicare Part A benefits so long as they are enrolled in Part A and regardless of

whether Medicare covers or pays for his or her hospitalization, but that same patient is "entitled" to SSI benefits, and thus included in the Secretary's count of SSI Days, only if he or she actually receives an SSI payment from the Social Security Administration ("SSA") during the month of his or her hospitalization.

7.      As explained below, the Secretary's dissimilar construction of the terms "entitled" in the DSH statute violates the Medicare Act, because it contravenes the statute's plain meaning and intent. It is also arbitrary and capricious, not in accordance with law, and in excess of statutory authority.

8.      As a result of the Secretary's erroneous construction of the statute which undercounts SSI Days, the Plaintiffs have been denied Medicare DSH payments to which they are lawfully entitled. The Plaintiffs therefore seek declaratory and injunctive relief against the Secretary, and an order setting aside the MACs' invalid payment determinations and directing the recalculation of the Plaintiffs' DSH adjustments in accordance with the plain meaning of the statute.

## JURISDICTION AND VENUE

9.      This case arises under Title XVIII of the Social Security Act, as amended, 42 U.S.C. § 1395, *et seq*. (the "Medicare Act"); the Administrative Procedure Act, 5 U.S.C. § 551, *et seq*.; and the Declaratory Judgment Act, 28 U.S.C. § 2201, to obtain judicial review of actions of the Secretary and his agents, the Medicare Administrative Contractors ("MACs"), which resulted in the Plaintiffs receiving reduced Medicare reimbursement for their fiscal years at issue.

10.      Jurisdiction is proper under 42 U.S.C. § 1395oo(f)(1) and 28 U.S.C. § 1331.

11.      Jurisdiction also lies pursuant to 28 U.S.C. § 1361 because the Plaintiffs are entitled to a writ of mandamus requiring the Secretary to ensure that the Providers' DSH

adjustments are calculated in accordance with the law from the best available data and to produce the same to the Plaintiffs for review.

12.     Venue is proper in this judicial district pursuant to 42 U.S.C. § 1395oo(f)(1) and 28 U.S.C. § 1391(e).

## PARTIES

13.     During the cost reporting periods at issue herein, all Plaintiffs were participating providers of hospital services under the federal Medicare program pursuant to Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.* All of the Plaintiffs are identified in the "schedules of providers" appended to the EJR Determinations issued in this matter (attached hereto as **Exhibits 1–3**), which pertain to PRRB Cases Nos. 19-2599G (**Exhibit 1**), 20-1341GC (**Exhibit 2**), and 17-1408G, 17-1600G, 17-1771G, 18-0133G, 18-0329G, 18-0334G, 18-1466G, and 18-1471GC (**Exhibit 3**). The EJR Determinations and the schedules of providers enumerate every claim the Plaintiffs appealed to the PRRB as part of a group, and all Plaintiffs are therein identified by their Medicare provider numbers, names and applicable fiscal years subject to this appeal.

14.     At all times relevant to these proceedings, all Plaintiffs had a Medicare provider agreement with the Secretary, and each was eligible to participate in the Medicare program.  At all times relevant hereto, each Plaintiff was an acute-care, inpatient hospital that served a disproportionate share of low-income patients.

15.     The Defendant is Xavier Becerra, in his official capacity as Secretary of the United States Department of Health and Human Services ("HHS"), the federal agency that administers the Medicare program.  References to the Secretary herein are meant to refer to him, to his subordinates and agents, and to his official predecessors or successor as the context requires.

16.     The Centers for Medicare and Medicaid Services ("CMS") is a component of HHS with responsibility for day-to-day operation and administration of the Medicare program. CMS was formerly known as the Health Care Financing Administration. References to CMS herein are meant to refer to the agency and its agents and predecessors.

## THE MEDICARE PROGRAM

17.     Medicare is a federal program that provides health insurance for the aged, disabled and certain individuals with end-stage renal disease. 42 U.S.C. § 1395, *et seq*. The Medicare program is federally funded and is administered by the Secretary through CMS and its contractors, the MACs. 42 U.S.C. §§ 1395kk and 1395kk-1.

18.     The Medicare Act is composed of five parts.  *See* 42 U.S.C. § 1395, *et seq*.

19.     Part A of the Medicare Act covers "inpatient hospital services."  *See* 42 U.S.C. §§ 426(c), 1395c, *et seq*.

20.     Part B is an optional program that covers physician services and certain other outpatient medical services that are not covered under Part A, if a premium is paid. *See* 42 U.S.C. §§ 1395j—1395w-6.

21.     Part C, known as the Medicare Advantage Program, allows participants to choose certain health plans as an alternative to the traditional fee-for-service model available under Parts A and B.  42 U.S.C. § 1395w-21(a).

22.     Part D, known as the Medicare Prescription Drug Benefit Program, was enacted as part of the Medicare Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066, which was signed into law on December 8, 2003. As relevant here, Medicare Part D provides, *inter alia*, fully subsidized drug benefits for SSI Enrollees. 42 U.S.C. §§ 1395w-101, 1395w-114; 42 C.F.R. § 423.773, 20 C.F.R. § 418.3105. Part D coverage first began on January 1, 2006.  42 U.S.C. § 1395w-101(a)(2).

23.    Part E sets forth various miscellaneous provisions, including the Medicare Secondary Payer ("MSP") requirements for coordinating benefits and the Prospective Payment System ("PPS") for reimbursing Part A inpatient hospital services. 42 U.S.C. § 1395x, *et seq*.

24.    The Medicare Part A benefit consists of the right to have Medicare payment made on a beneficiary's behalf for a limited number of days of inpatient hospital care during a spell of illness. *See* 42 U.S.C. §§ 426(a), 1395d(a)(1). Specifically, the Part A benefit entitles an individual to have payment made on his or her behalf for up to 90 days of inpatient hospital services in a spell of illness, with a lifetime reserve of 60 additional days that a beneficiary may elect to use. 42 U.S.C. § 1395d(a)(1); 42 C.F.R. § 409.61(a).

## MEDICARE DSH PAYMENT

25.    Since 1983, the Medicare program has paid most hospitals under a prospective payment system ("PPS") for inpatient hospital services furnished to an individual who is entitled to benefits under Medicare Part A.  42 U.S.C. §§ 1395ww(d)(1)-(5); 42 C.F.R. Part 412.

26.    Under the PPS, hospitals are reimbursed for providing inpatient services to Medicare beneficiaries at a predetermined rate based on the diagnosis-related grouping ("DRG") to which a patient is assigned.  Each DRG represents the average resources that are required to provide the inpatient services described by the particular DRG category relative to the national per case average for inpatient hospital services.  42 U.S.C. § 1395ww(d)(4) & (5).

27.    Medicare pays these predetermined, standardized amounts per hospital discharge, subject to certain upward payment adjustments for certain qualifying hospitals. *Id.*

28.    The standard rate paid under the PPS is based on a national average amount of operating costs incurred to treat a Medicare patient with the assigned DRG. *See id.*  The payment per discharge is subject to further adjustments to account for additional hospital-specific

factors that may cause a hospital to incur greater than average operating costs to treat each Medicare Part A patient.  *See* 42 U.S.C. § 1395ww(d)(5).

29.    One of the PPS payment adjustments is the DSH payment. 42 U.S.C. § 1395ww(d)(5)(F); 42 C.F.R. § 412.106.  A hospital that serves a disproportionate share of low-income patients is entitled to an upward percentage adjustment to the standard payment rate per discharge under the PPS.  *Id*.

30.    The DSH adjustment is a percentage add-on to the standard payment rate per hospital discharge under the Part A prospective payment system.  It is intended to compensate a hospital for the higher-than-average costs of treating low-income Medicare beneficiaries whose care is paid under the Part A PPS.  *See* H.R. Rep. No. 99-241, at 15 (1985), *reprinted in* 1986 U.S.C.C.A.N. 579, 593-94.  When it created the DSH adjustment, Congress identified two reasons why hospitals treating a disproportionate share of low-income patients have higher-than-average costs.  One reason is that low-income Medicare patients are more costly than average to treat; the other is that hospitals that treat a large proportion of low-income patients overall tend to incur higher costs per case for all patients, due in part to the specialized services they provide and other structural characteristics of these hospitals.  *Id.*

## THE DSH PAYMENT CALCULATION

31.    Calculation of the DSH Payment add-on turns on a hospital's "disproportionate patient percentage" ("DPP"), which is the sum of two fractions expressed as percentages. *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi); 42 C.F.R. §§ 412.106 (b)-(d).

32.    Generally, the greater the two percentages, the greater the DSH payment to a hospital.

33.    One of the two fractions used to calculate a hospital's DSH payment is commonly called the "Medicare fraction."  The statute defines the Medicare fraction as:

the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were *entitled to benefits under [P]art A of [Title XVIII]* and were *entitled to supplementary security income benefits* (excluding any State supplementation) under subchapter XVI of this chapter ["**SSI Days**"], and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were *entitled to benefits under [P]art A of [Title XVIII.]*

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) (emphasis added). As the italicized language indicates, the

Medicare fraction consists solely of days for patients who were "entitled to benefits under Part

A" of Medicare and/or "entitled to [SSI] benefits." *Id.* The denominator includes all patient

days for which patients were "entitled to" Part A benefits; whereas the numerator includes only

those Part A days for patients who were also "entitled to" supplemental security income benefits

under Title XVI during the month in which they were hospitalized.

34.     The second of the two fractions used to compute a hospital's DSH payment is

referred to as the "Medicaid fraction." The statute defines the Medicaid fraction as:

the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consists of patients who (for such days) were *eligible for medical assistance under a State plan approved under [Title XIX]*, but who were *not entitled to benefits under [P]art A of [Title XVIII]*, and the denominator of which is the total number of the hospital's patient days for such period. [1]

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added). As emphasized above, the numerator of

the Medicaid fraction consists of days for patients who both were eligible for medical assistance

under Title XIX, or Medicaid, and were "not entitled to benefits under [P]art A" of Title XVIII,

or Medicare, for their "patient days" in the hospital.

35.     The SSI program is a federal program that provides benefits to low-income

individuals who are either aged 65 or older, or are blind or disabled. The SSI program is

---

[1] This statute refers to "this subchapter," which means subchapter XVIII of Chapter 7 of Title 42 of the United States Code, also known as Title XVIII of the Social Security Act.

administered by the Social Security Administration ("SSA") under Title XVI, and provides financial and other benefits—including registering SSI Enrollees for fully subsidized Medicare Part D prescription drug benefits through the Extra Help program. *See* 42 U.S.C. § 1381, *et seq.*; 42 U.S.C. § 1395w-114; 42 C.F.R. § 423.773 and 20 C.F.R. § 418.3105; *see also* CMS Manual 100-18, Chapter 13, Premium and Cost-Sharing Subsidies for Low-Income Individuals, at §§ 40.2.2, 40.2.5, 70.5.2.

36.    To implement the DSH legislation, CMS determines the number of SSI Days for those patients entitled to both Medicare Part A and SSI by matching data from the Medicare Provider Analysis and Review ("MedPAR") file, which is Medicare's database of Provider inpatients, and the Medicare Enrollment Database (EDB), with a file created for CMS by SSA to identify SSI-"entitled" individuals. 75 Fed. Reg. 50,041, 50,277-81 (Aug. 16, 2010).

37.    The MACs are private insurance companies that perform certain Medicare audit and payment functions under contracts with CMS. As is relevant here, the MACs determine payment amounts due the hospitals under Medicare law and regulations. 42 U.S.C. § 1395h, 42 C.F.R. § 413.20. The MACs review the cost report, determine the total amount of Medicare reimbursement due the provider and issue the provider a Notice of Program Reimbursement ("NPR"). *See* 42 C.F.R. § 405.1803.

38.    A provider dissatisfied with the MAC's final determination of total reimbursement may file an appeal with the Board within 180 days of the issuance of the NPR (or a revised NPR ("RNPR")). 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835.

39.    The Board is required to apply all statutes, regulations, and orders applicable to the Medicare program. 42 U.S.C § 1395oo. When a provider challenges the validity of a statute, regulation, or order through a jurisdictionally proper appeal, the Board is required to grant

expedited judicial review ("EJR") of the matter, permitting the provider to raise their claims in federal court without the need for an administrative hearing.  42 U.S.C. § 1395oo(f)(1).

**<u>SECRETARY'S CONSTRUCTION OF THE DSH STATUTE</u>**

40.    The composition of the numerator and denominator of both the Medicare and Medicaid fractions is determined by the meaning and intent of the terms "entitled" and "eligible" in the DSH statute.

41.    Over the last three decades, the Secretary has vacillated in his approach to construing the DSH statute, resulting in a litany of litigation and agency policy changes.

42.    Due to the significant impact of the meaning ascribed to the terms "entitled" and "eligible" in the DSH statute, the Secretary's construction of their meaning and their application to Providers' program reimbursement has been repeatedly challenged.

43.    On review, federal courts have effectively concluded that Congress used the terms "entitled" and "eligible" interchangeably and without meaningful distinction. *See Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 12-13 (D.C. Cir. 2011) (noting that "the usual rule that Congress intends different meanings when it uses different words has little weight here …. [I]t would be a mistake to read too much into the difference in nomenclature") (collecting cases).

44.    Prior to October 1, 2004, the Secretary construed the term "entitled" in the DSH statute to mean that a patient was "entitled to benefits under Part A" of Medicare when Medicare Part A covered and paid for the patient's hospitalization. For instance, if the patient's spell of illness exceeded 90 days such that his Part A benefits were exhausted, the patient was deemed not to be "entitled to" Part A Medicare benefits for purposes of the DSH calculation. *See* 42 C.F.R. § 412.106(b)(2)(1)(2003); *see also* 51 Fed. Reg. 16,772, 16,788 (May 6, 1986); 51 Fed. Reg. 31,454, 31,460-61 (Sept. 3, 1986). Thus, hospital days for which dual-eligible patients— patients eligible for both Medicare and Medicaid—had exhausted their Medicare Part A benefits

13

were therefore excluded from the numerator and denominator of the Medicare fraction because such days were not "covered" by Medicare. In accordance with this construction, the Secretary held that days attributable to patients who had exhausted their Medicare Part A benefits should be counted in the numerator of the Medicaid fraction if the person was eligible for Medicaid. *See Presbyterian Med. Ctr. of Philadelphia v. Aetna Life Ins. Co.*, CMS Adm'r Dec., 96-D75, MEDICARE & MEDICAID GUIDE (CCH) ¶45,032 (Nov. 29, 1996).

45.    In 2003, however, the Secretary proposed to change the interpretation of the DSH statute in 68 Fed. Reg. 27,154, 27,201-08 (May 19, 2003), despite there having been no change in the underlying statute. In that notice of proposed rulemaking, the Secretary erroneously stated that the then-current policy required all dual-eligible days to be counted in the Medicare fraction even after a Medicare beneficiary exhausted his or her Part A benefits.

46.    The Secretary did not act upon this proposal in the final PPS rule for federal fiscal year 2004.  68 Fed. Reg. 45,346, 45,422 (Aug. 1, 2003).

47.    A year later, however, in 2004, the Secretary reversed course and adopted what he then acknowledged was a new policy: to include Medicare Advantage (Part C) days and Medicare Exhaust days in the Medicare fraction. 69 Fed. Reg. 48,916, 49,098-99 (Aug. 11, 2004) (acknowledging that the Secretary had never before counted Part A exhaust days in the Medicare fraction and explaining the misstatement he had made in the proposed rulemaking of May 19, 2003).

48.    The Secretary effected this change by striking the word "covered" from the existing Medicare fraction regulation, reflecting a fundamental change to the construction of the term "entitled" to benefits.  *Compare* 42 C.F.R. § 412.106(b)(2)(i) (2003) *with* 42 C.F.R. § 412.106(b)(2)(i) (2005); *see also* 69 Fed. Reg. 48,916, 49,246 (Aug. 11, 2004).

49.    In the summer of 2007, without providing notice or the opportunity to comment, the Secretary issued a technical correction to the regulation regarding CMS' policy on Medicare Advantage days. Specifically, the Secretary amended the DSH regulation to conform the text to effectuate the "policy change" announced in the 2004 rulemaking, 72 Fed. Reg. 47,130, 47,384 (Aug. 22, 2007), to provide that the Medicare fraction included all patient days for "patients entitled to Medicare Part A (or Medicare Advantage (Part C))." 42 C.F.R. §§ 412.106(b)(2)(i)(B) and (iii)(B).  The stated effective date for the 2007 rule was October 1, 2007.  72 Fed. Reg. at 47,130.

50.    As with Medicare Advantage days, the Secretary's 2003 and 2004 rules did not expressly address the Agency's treatment of days attributable to Medicare Part A beneficiaries whose Part A benefits were subject to Medicare Secondary Payer limitations, *i.e.*, whose healthcare services are not paid by Medicare because Medicare is secondary to a group health insurer or a third-party payer.  However, in its final IPPS rule for Fiscal Year 2006, the Agency noted it had "updated . . . [42 C.F.R.] § 412.106(b) to reflect the inclusion [in the Medicare Part A fraction] of days for which Medicare was not the primary payer."  70 Fed. Reg. 47,287, 47,441 (Aug. 12, 2005).

51.    None of these amendments discussed the broader impact of the changing definition of "entitled," or, in particular, its application to SSI Enrollees.

52.    In 2008, this Court issued its memorandum opinion and order in *Baystate Medical Center v. Leavitt,* 545 F. Supp. 2d 20, *amended by* 587 F. Supp. 2d 37 (D.D.C. 2008), which required the Secretary to correct several systemic errors in his calculation of the Medicare fraction that uniformly deflated the numerator of the fraction (SSI Days), and inflated the

denominator, thus reducing the fraction overall and, as a result, reducing the DSH payments made to hospitals.

53.    In April 2010, the Secretary issued CMS Ruling 1498-R directing MACs and advising hospitals that the interpretation of the DSH statute embodied in 42 C.F.R. § 412.106(b) applied to cost reporting periods preceding the October 1, 2004 effective date of the amendment and all pending appeals before the PRRB.  *See* CMS Ruling No. CMS-1498-R (April 28, 2010).

54.    CMS Ruling 1498-R applied to three categories of appeals: (1) challenges to CMS' data matching process for matching Medicare and SSI entitlement data in determining the Medicare fraction; (2) challenges to the exclusion from the Medicaid fraction of the DPP of non-covered inpatient hospital days; and (3) challenges to the exclusion from the DPP of labor/delivery room (LDR) inpatient days.

55.    Pursuant to CMS Ruling 1498-R, any appeal involving any of the above three categories had to be remanded by the Board to the MAC. The Ruling further required the MAC to include certain inpatient provider days, *i.e.*, MSP and exhausted benefit days, in the Medicare fraction when it revised the Medicare fraction following remand.

56.    CMS Ruling 1498-R also required CMS to re-compute the Medicare fraction using the revised SSI-data matching process mandated by the district court in *Baystate*, 587 F. Supp. 2d at 44.

57.    CMS Ruling 1498-R was issued without advance notice to the public and without affording hospitals an opportunity for comment.

58.    One month later, on May 4, 2010, the Secretary announced yet another proposed amendment to the DSH regulation to obviate any confusion made by the prior changes. "In order to further clarify our policy that patient days associated with [Medicare Advantage Plan]

beneficiaries are to be included in the [Medicare] fraction because they are still entitled to benefits under Medicare Part A, we are proposing to replace the word 'or' with the word 'including' in [42 C.F.R.] § 412.106(b)(2)(i)(B) and § 412.106(b)(2)(iii)(B)." *See* 75 Fed. Reg. 24,000, 24,006-07.

59.     The amendment to the regulation was adopted in the 2011 IPPS Final Rule dated August 16, 2010, without modification, *see* 75 Fed. Reg. 50,275, 50,286 (Aug. 16, 2010), resulting in multiple challenges to the amendment and its retroactive application. *See, e.g., Catholic Health Initiatives—Iowa Corp v. Sebelius*, 841 F. Supp. 2d 270 (D.D.C. 2012), *rev'd*, 718 F.3d 914 (D.C. Cir. 2014); *Metropolitan Hosp. v. United States Dep't of Health & Human Servs.*, 702 F. Supp. 2d 808 (W.D. Mich. 2010), *rev'd*, 712 F.3d 248 (D.C. Cir. 2013).

60.     Ultimately, the courts upheld the Secretary's new, expansive interpretation of the term "entitled" in the phrase "entitled to benefits under [P]art A" as meaning the patient met the "qualifying Medicare statutory criteria." *See, e.g., Catholic Health*, 718 F.3d at 919–20; *see also* CMS Ruling No. CMS-1498-R2 at 1–10 (Apr. 22, 2015). In *Stringfellow Memorial Hosp. v. Azar*, No. 17-309 (D.D.C. June 29, 2018), Chief Judge Howell decided that the Secretary's 2004 rulemaking was not arbitrary and capricious. That decision relies heavily on the Secretary's acknowledgement that Part A beneficiaries who exhausted their benefits "may still be entitled to other Part A benefits." *Id.* at 35 (citing 69 Fed. Reg. at 49,098).

61.     Despite the Secretary's wholesale expansion of the meaning of "entitled to benefits under Medicare [P]art A" to include covered and non-covered inpatient days, the Secretary continues to construe the term "entitled to supplemental security income benefits" narrowly, to require a cash benefit payment from the Social Security Administration for the month of hospitalization. The Secretary has continued to exclude from its count of SSI Days

those SSI Enrollees who did not receive a cash SSI stipend from SSA during the month of their inpatient hospitalizations. 75 Fed. Reg. 50,275-286 (Aug. 16, 2010); *see Metropolitan Hosp.*, 712 F.3d at 263–65.

62.     The Secretary construes two uses of the term "entitled" that appear in the same sentence of the Medicare fraction of the DSH statute differently, in contravention of well-established statutory principles. *See Sorenson v. Secretary of Treasury*, 475 U.S. 851, 860 (1986) (identical words in same statute have same meaning).

63.     The Secretary takes the view that patients for whom Medicare Part A neither covers nor pays their inpatient hospitalizations are nevertheless entitled to Medicare Part A if they meet the qualifying statutory criteria for and are enrolled in the Medicare program.

64.     At the same time, the Secretary maintains that SSI Enrollees, that is, patients who qualify for and are enrolled in the SSI program, are not entitled to SSI benefits absent their receipt of a cash payment from the SSA during the month in which they are hospitalized, even when the SSI Enrollee should have received a cash payment but did not for various administrative reasons.

65.     Under the SSI statute, however, every aged, blind or disabled individual whose income and resources meet the statutory criteria are SSI-qualified and entitled to SSI program benefits. *See* 42 U.S.C. §§ 1381a & 1382.

66.     One of the benefits of SSI enrollment for beneficiaries who also have Medicare is fully subsidized Medicare Part D prescription drug benefits, irrespective of whether that SSI enrollee receives a monthly payment from the SSA, *i.e.*, an SSI check for the month in question. *See* 42 C.F.R. § 423.773 and 20 C.F.R. § 418.3105.  Because SSI Days include only patients who

participate in both the SSI and Medicare programs for purposes of the DSH statute, the Part D benefit applies to all SSI Enrollees at issue in this appeal.

67.     The Secretary considers an SSA award letter to be sufficient evidence of the Medicare beneficiary's SSI entitlement to qualify that SSI Enrollee for a full Medicare Part D prescription drug benefit subsidy. Centers for Medicare and Medicaid Services, Find Your Level of Extra Help (Part D), https://www.medicare.gov/your-medicare-costs/help-paying-costs/extra-help/level-of-extra-help.html; CMS Manual 100-18, Chapter 13, Premium and Cost-Sharing Subsidies for Low-Income Individuals, at §§ 40.2.2, 40.2.5.

68.     Because the Secretary has interpreted the term "entitled" in the DSH statute to mean meeting the eligibility criteria for a benefits program and does not require payment or receipt of program benefits, all SSI Enrollees must be included in the Secretary's count of SSI Days.

69.     The Secretary's directive to include only those SSI Enrollees who receive an SSI payment during the month in which they are hospitalized runs contrary to the plain language of the DSH statute and Congress's intent to have Medicare-entitled SSI Enrollees serve as a proxy for low-income patients.

70.     The Secretary's incorrect and improper construction of the term "entitled" to SSI benefits thwarts Congress's intent and denies the Plaintiffs the reimbursement to which they are entitled.

## FACTUAL BACKGROUND RELEVANT TO PLAINTIFFS' ADMINISTRATIVE APPEALS

71.     Any Medicare provider dissatisfied with a final determination of the Medicare program regarding the provider's PPS payments for a "cost reporting period," *i.e.*, the provider's fiscal year, may appeal that determination to the PRRB following receipt of their NPR or RNPR.

72.     Pursuant to 42 U.S.C. § 1395oo(a) and (b) and 42 C.F.R. §§ 405.1835 and 405.1837, a hospital may file an appeal to the Board individually if the amount in controversy is $10,000 or more, or may file a group appeal of an issue that is common to two or more hospitals if the aggregate amount in controversy is $50,000 or more.

73.     The Plaintiffs timely filed individual or group appeals with the PRRB, and argued that their DSH adjustments were understated because the Secretary categorically excluded from the SSI Days all SSI Enrollees who did not receive an SSI payment for the month in which they were hospitalized.

74.     In their position papers filed with the PRRB, the Plaintiffs established that the Secretary's construction of the statute conflicts with the DSH statute's plain language, meaning and intent.

75.     In their position papers, the Plaintiffs demonstrated that the Secretary's erroneous reading of Title XVI, 42 U.S.C. § 1381, *et seq*., and his reliance on the SSA's assignment of three (3) Payment Status Codes ("PSC Codes") C01, M01, and M02—to the exclusion of seventy-four (74) other PSC Codes that SSA assigns to SSI Enrollees—to identify patients "entitled" to SSI benefits and thus determine SSI Days, conflicts with the DSH statute's mandates.[2]

76.     Plaintiffs established that the Secretary erroneously relies on SSA PSC Codes C01, M01, and M02, and excludes all others, to determine whether inpatients were entitled to SSI benefits during their hospitalization, resulting in the nonsensical and categorical exclusion of numerous patients who were low-income SSI Enrollees from the total SSI Days.  Specifically, in reliance on the SSA's assignment of only three particular PSC Codes, the Secretary excludes

---

[2] Plaintiffs do not include PSC Codes, *e.g*., T-Codes, indicating that a patient has been terminated from the SSI program.

certain SSI Enrollees from the DSH calculation for reasons wholly unrelated to their qualification for and entitlement to SSI benefits. For example, if the agency unilaterally applies an SSI Enrollee's monthly SSI payment to the Enrollee's pre-existing debt to the agency or to another federal agency—known as cross-program recovery—those SSI Enrollees' patient days are not counted as SSI Days, despite the fact that the beneficiary was in fact paid for that month, because the PSC Code for that scenario is not C01, M01, or M02.

77.    The Secretary's policy additionally excludes SSI Enrollees entitled to receive their SSI checks but for whom SSA is uncertain of the current address of the SSI Enrollee or their representative payee, so their checks are held until this information is verified—a scenario described by PSC Code S06, with the "S" indicating a suspended payment status. *See* 75 Fed. Reg. at 50,275, 50,280 (Aug. 16, 2010). The fact that an SSI Enrollee's address is unknown, however, provides no basis to deny them SSI payment under the applicable regulations. *See* 20 C.F.R. §§ 416.207–.216. The fact that an SSI Enrollee's address is unknown is not one of the reasons specified in the SSI regulations for nonpayment; therefore, no basis exists for the Secretary to exclude these patient days from the total SSI Days.

78.    Providers also established that at the time Congress enacted the DSH statute in 1986, SSI Enrollees received SSI checks the month in which they initially qualified for benefits. Since 1996, however, SSI Enrollees do not receive SSI payments that first month; rather, they receive them the month after they qualify for benefits.  In the interim between the time SSI Enrollees qualify for enrollment and receive their first SSI payment, however, the SSA codes these patients as E02, and the Secretary unlawfully excludes them from the total SSI Days although they clearly meet SSI eligibility criteria.

79.     In their position papers, the Plaintiffs also demonstrated that the Secretary ignored the import of SSI Enrollees' continuing receipt of other SSI program benefits. For example, SSI Enrollees receive automatic enrollment in the Part D Extra Help program and fully subsidized Medicare Part D benefits. Plaintiffs also demonstrated the incongruity with which these other SSI program benefits are treated vis-à-vis Medicare Part A benefits for purposes of the DSH payment calculation. *See* 75 Fed. Reg. at 50,275–86 (Aug. 16, 2010).

80.     By ignoring the fact that: (1) the Medicare Part D Extra Help program provides full payment for Medicare Part D prescription drug coverage to SSI Enrollees; (2) SSI Enrollees' receipt of Part D Extra Help benefits is immediate upon notification of their SSI enrollment, known as the SSI award letter; and (3) once awarded, the SSI Enrollees receive the fully subsidized Part D benefits without regard to their receipt of monthly SSI cash benefits, the Secretary reveals his discordant construction of the DSH statute. The Secretary cannot lawfully exclude such qualified-benefit receiving SSI Enrollees' patient days from the total SSI Days.

81.     In their position papers, the Plaintiffs illustrated the dramatic impact the Secretary's arbitrary exclusion of certain SSI Enrollees has on their DSH adjustments by demonstrating—through SSA data—that more than one million of the country's total SSI Enrollees are subject to payment suspensions of varying lengths in any given year.  Because the Secretary deems them not entitled to SSI benefits under his narrow construction of the DSH statute, these SSI Enrollees' patient days are excluded from the total SSI Days in the month of their hospitalizations.

82.     In each of the EJR Determinations at issue, the PRRB concluded that it lacked authority to review or mandate specific revisions to CMS' data matching process because it was

constrained by CMS rulemaking under CMS Rulings 1498-R and 1498-R2. Accordingly, the Board held that it did not have the authority to reverse the MACs' adjustments. *Id.*

83.    In the FFY 2011 IPPS Final Rule, the Secretary acknowledged that he relies exclusively on SSA PSC Codes C01, M01, and M02 to identify patients "entitled" to SSI benefits for purposes of inclusion as SSI Days in the numerator of the Medicare fraction. 75 Fed. Reg. 50,042, 50,280-81 (Aug. 16, 2010).

84.    In their papers before the Board, the Plaintiffs established that SSI Enrollees assigned one of the other 74 PSC Codes remain entitled to SSI benefits, but simply are assigned another PSC Code to indicate, for example, that they have either moved (PSC Code S06) or are currently repaying another government obligation under the Cross-Program Recovery (PSC Code E01).

85.    In the FFY 2011 IPPS final rule, the Secretary failed to address or even acknowledge that the excluded SSI Enrollees are entitled to other SSI program benefits and fully subsidized Medicare Part D benefits as a result of their SSI enrollment, irrespective of their receipt of the monthly SSI stipend. The Board's decisions were received by counsel, on behalf of the Plaintiffs, between December 16, 2021, and December 21, 2021. *See* **Exhibits 1–3**. The Plaintiffs' administrative rights have therefore been exhausted and this matter is now ripe for judicial review.

86.    This Complaint has been timely filed within 60 days of receipt of the Board's determinations, as required by 42 U.S.C. § 1395oo(f)(1).

## COUNT I

### The Secretary's Construction of the DSH Statute
### Contravenes the Statute's Plain Language

87.    Plaintiffs repeat and reallege paragraphs 1–86 as if set forth fully herein.

88.     The Medicare statute provides for judicial review of the Secretary's final determination on Medicare program reimbursement under 42 U.S.C. § 1395oo(f)(1).

89.     The Administrative Procedure Act provides that the reviewing court shall hold unlawful and set aside agency action found to be: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (3) without observance of procedure required by law; or (4) unsupported by substantial evidence.  5 U.S.C. § 706(2).

90.     The Secretary's construction of the DSH statute since 2004 draws a baseless distinction between Medicare Part A beneficiaries and SSI Enrollees.   Under the current construction of the DSH statute, the Secretary maintains that the phrase "entitled to benefits under part A" is a term of art that broadly encompasses days for which Medicare Part A makes no payment, including Medicare Exhaust days, Medicare Secondary Payer days and Medicare Advantage Plan days.  That broad interpretation of "entitlement to benefits" must apply equally to Medicare beneficiaries who are SSI Enrollees.

91.     Medicare Part A beneficiaries enrolled in SSI meet the qualifying statutory criteria for SSI entitlement and are eligible for the program on the basis of their income, resources, age and/or disability. *See* 42 U.S.C. §§ 1381a & 1382. Consequently, because the term "entitled" in the DSH statute has been interpreted to mean meeting the eligibility criteria for a benefits program and does not require payment of benefits from the program, the plain language requires that all SSI Enrollees be deemed entitled to SSI benefits and have their patient days counted as SSI Days.

92.     SSI Enrollees who did not receive an SSI cash payment for the month during which they were hospitalized, *i.e.*, those assigned a PSC Code other than C01, M01, or M02,

remain entitled to benefits, including fully subsidized Medicare Part D Prescription Drug benefits, and their inpatient hospital days must be counted as SSI Days.

93.    Because the Secretary's conflicting interpretations and application of the term "entitled" contravenes the Medicare DSH statute and frustrates Congressional intent, it is due no deference under *Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and is invalid under 5 U.S.C. § 706.

## COUNT II

### The Secretary's Interpretation of the DSH Statute is Arbitrary and Capricious and Therefore Invalid Under Both the Administrative Procedure Act and the Medicare Act

94.    Plaintiffs reallege and reincorporate paragraphs 1–93 above as if set forth fully herein.

95.    The Secretary's action is subject to judicial review pursuant to the applicable provisions of the APA.  42 U.S.C. § 1395oo(f)(1).

96.    Under the APA, a reviewing court must set aside agency action if, *inter alia,* it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

97.    The Secretary's decision must be set aside as arbitrary and capricious because it is inconsistent with his prior and subsequent interpretations of the statute as codified in his 2004 amendment to 42 C.F.R. § 412.106(b)(2)(i).  *See* 69 Fed. Reg. 49,009, 49,098–99 (Aug. 11, 2004).

98.    By striking the term "covered" from the DSH regulation, 42 C.F.R. § 412.106(b)(2)(i), the Secretary sought to clarify his construction of the DSH statute by removing any requirement that Medicare Part A cover or pay for the patient's hospitalization, and by allowing for Medicare Exhaust days, for example, to be included in the Medicare fraction

because the patient still qualified for Medicare Part A benefits under the Secretary's expanded view of the term "entitled."

99.    Yet, following his elimination of the term "covered" from the DSH regulation, the Secretary failed to apply and harmonize his expanded construction of the term "entitled to [P]art A benefits" to "entitled to SSI benefits."  In failing to consider the impact of the change, or incorporate his expanded construction of the term "entitled" to SSI Enrollees, or provide any explanation for his differing interpretations, the Secretary's action was arbitrary and capricious and not in accordance with law under 5 U.S.C. § 706(2)(A).  *See also* 42 U.S.C. § 1395hh(a)(1)–(4).

100.    The problems attendant to the Secretary's reliance solely on the SSA PSC Codes C01, M01 and M02 to compute SSI Days, were identified and challenged in comments to the 2011 proposed rule, *see* 75 Fed. Reg. 50,002, 50,279–82 (August 16, 2010), yet the Secretary chose to ignore the fact that SSI Enrollees assigned PSC Codes other than C01, M01 and M02 should be deemed entitled to SSI benefits for purposes of inclusion in the SSI Days count. Moreover, the Secretary failed to address or even acknowledge that since 2006, SSI Enrollees on Medicare receive other SSI benefits as a result of their SSI enrollment and irrespective of their receipt of a monthly SSI stipend, including fully subsidized Medicare Part D. In so doing, the Secretary's action was arbitrary and capricious and not in accordance with law under 5 U.S.C. § 706(2)(A).

101.    The Secretary's decision must be set aside because it ignores other benefits, including Medicare Part D Extra Help program benefits, SSI Enrollees receive, and results in the unlawful omission of low-income patients Congress intended to capture in the DSH computation.

102.    The Secretary's decision must be set aside because it ignores CMS's own acknowledgment that upon receipt of an SSI award letter, a Medicare beneficiary is entitled to other benefits because that beneficiary is an SSI Enrollee.

103.    As a result of the Secretary's conduct, the Plaintiffs have been harmed by the reduced disproportionate patient percentage and resulting reduction in Medicare payments.

## COUNT III

### Mandamus to Recalculate Providers' DPP and to Produce All SSI Entitlement Data

104.    Plaintiffs reallege and reincorporate paragraphs 1–103 above as if set forth fully herein.

105.    In addition to erroneously construing the DSH statute to systematically reduce the number of counted SSI Enrollees, the Secretary has also violated Section 951 of the Medicare Modernization Act, which requires him to provide the Plaintiffs with all information needed to calculate the DSH computation. *See* MMA, Pub. L. No. 108-173.

106.    As the Plaintiffs established in their position papers, the Secretary has access to the SSI eligibility data, including every Medicare patient's PSC Codes for all SSI Enrollees, but has refused to release these data, even after multiple Freedom of Information Act requests, based on contractual and privacy considerations. *See also* 70 Fed. Reg. 47,438–51 (Aug. 12, 2005).

107.    Plaintiffs unsuccessfully sought to obtain relevant data from alternative sources, including CMS and SSA, to establish an approximate measure of the number of patients who are SSI Enrollees benefits but were omitted from the Secretary's count of SSI Days.

108.    The Secretary must provide Plaintiffs with access to the SSI enrollment data which is furnished to the Secretary by the SSA.  Section 951 of the MMA required HHS to arrange by December 8, 2004 to furnish providers with the data necessary to compute the number of patient days used in calculating the DPP.

109.    The requirements of Section 951 may be satisfied only by furnishing providers with access to the SSI enrollment files which are available to the Secretary from the SSA, including each SSI Enrollee's assigned PSC code. No legal remedies exist to compel the disclosure; accordingly, the Plaintiffs may seek relief by way of a writ of mandamus.

110.    As a result of the Secretary's conduct, the Plaintiffs have been harmed by way of their reduced DPPs and resulting reduced Medicare payments. Specifically, the Plaintiffs have been deprived of the tools required to establish that the Secretary is underreporting the patient days in their low-income proxy, including SSI Days, which results in lower DSH adjustments.

111.    Plaintiffs are therefore entitled to a writ of mandamus pursuant to 5 U.S.C. § 706(1) and 28 U.S.C. § 1361 for purposes of directing the Secretary to furnish such data relating to SSI Enrollees that are excluded from the SSI Days count because they are assigned one of the other 74 PSC codes that indicate a temporary suspension of SSI payment.

112.    Plaintiffs are further entitled to a writ of mandamus directing that the Secretary recalculate their DPP to include in the Medicare fraction of the DSH statute all patient days for SSI Enrollees.

## COUNT IV
### The Secretary's 2016 Regulations Providing Substantive Claim Requirements Are Invalid and Violate Providers' Statutory Right to an Appeal

113.    Plaintiffs reallege and reincorporate paragraphs 1–112 above as if set forth fully herein.

114.    For cost report periods beginning on or after January 1, 2016, if the Board issues an EJR determination where EJR is granted regarding a legal question that is relevant to the specific item under appeal, the Board's decision must additionally make specific findings of fact and conclusions of law on the question of whether the provider's cost report included an

appropriate claim for the specific item. *See* 42 C.F.R. §§ 405.1873, and 413.24(j) (hereinafter the "2016 Regulation"); *see also* FY 2015 IPPS/LTCH Final Rule, 79 Fed. Reg. 50199–50201; Provider Administrative Appeals and Judicial Review Final Rule, 80 Fed. Reg. 70,298, 70,551 *et seq*. (Nov. 13, 2015).

115.    For all of the Plaintiffs' claims, the Board granted EJR. However, for three of the Plaintiffs—Great River Medical Center n/k/a Southeast Iowa Regional Medical Center – West Burlington (Provider No. 16-0057; FYE 06/30/2017; PRRB Case No. 19-2599G, **Exhibit 1**), Mayo Clinic Health System – Franciscan Healthcare in La Crosse (Provider No. 52-0004; FYE 12/31/2016; PRRB Case No. 20-1341GC, **Exhibit 2**), and Mayo Clinic Health System in Eau Claire (Provider No. 52-0070; FYE 12/31/2016; PRRB Case No. 20-1341GC, **Exhibit 2**)—the Board additionally found that the substantive claim requirements were not met. However, the substantive claim requirements are invalid as contrary to law and to Supreme Court precedent.

116.    Before the 2016 Regulation was created as a substantive reimbursement requirement effective for cost reporting periods ending on or after December 31, 2016, a nearly identical policy and corresponding regulation existed as jurisdictional requirements, but those requirements were stricken as contravening the Medicare Act. *See Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 401–04 (1988) (finding it futile that a provider should submit for the MAC's consideration any constitutional or statutory challenges to regulations that the MAC is confined to apply without discretion); and *Banner Heart Hosp. v. Burwell*, 201 F. Supp. 3d 131, 142 (D.D.C. 2016) (concluding that, under *Bethesda*, a 2008 regulation requiring all self-disallowances be included on the cost report could not be applied to appeals raising a legal challenge to a regulation or other policy that the MAC was without authority to address).

117.    The Board's statutory authority under § 1395oo(d) explicitly provides that in making its decision whether to affirm, modify, or reverse the intermediary's decision, the Board can "make any other revisions on matters covered by such cost report . . . even though such matters were not considered by the intermediary in making such final determination." *Bethesda*, 485 U.S. at 405–06 (quoting § 1395oo(d)). "Under this statutory scheme, requiring submission of the regulatory challenge to the fiscal intermediary is quite unnecessary." *Id.* at 407.

118.    Nevertheless, after the 2008 regulation was stricken with regard to purely legal challenges, the Secretary promulgated a new but practically identical regulation effective January 1, 2016 that converted the defeated jurisdictional prerequisite into a prerequisite *for payment* under the substantive cost reporting requirements. *See* 42 C.F.R. §§ 405.1835, 413.24(j).

119.    Section 413.24(j) states that providers "must include an appropriate claim for the specific item, by ***either***— (i) Claiming full reimbursement in the provider's cost report *for the specific item* in accordance with Medicare policy, if the provider seeks payment for the item that it believes comports with program policy; ***or*** (ii) Self-disallowing *the specific item* in the provider's cost report, if the provider seeks payment that it believes may not be allowable or may not comport with Medicare policy (for example, if the provider believes the contractor lacks the authority or discretion to award the reimbursement the provider seeks for the item)." (Emphasis added).  Where some reimbursement for the item is available, it is nonsensical to require that the Provider forego available reimbursement in favor of self-disallowing greater reimbursement to be sought in a future appeal, or that the Provider *both* claim full reimbursement in accordance with Medicare policy *and* self-disallow *supplemental* payment it believes it is entitled to for the specific item.  *Bethesda*,  485 U.S. at 404 ("[T]he submission of a cost report in full compliance with the unambiguous dictates of the Secretary's rules and regulations does not, by itself, bar the

provider from claiming dissatisfaction with the amount of reimbursement allowed by those regulations.").

120.    The 2016 Regulation bars any recovery on a claim of dissatisfaction if the provider's cost report conforms to the Secretary's rules and regulations but does not explicitly self-disallow specific items by including an estimated reimbursement amount in the protested amount line of the provider's cost report and attaching a separate worksheet to the cost report for each protested item explaining why the item is being self-disallowed and describing how the provider calculated the estimated reimbursement amount. 42 C.F.R § 413.24(j)(1)-(2).

121.    In its substantive claim challenge, the MAC asserted that because it was not advised of the Plaintiffs' regulatory challenge, which it admittedly had no authority to address, the Board—and any later reviewing entity—therefore lacks authority to award payment for the items.

122.    As stated above, the Board has jurisdiction over a provider's appeal if the provider expresses dissatisfaction in the amount of reimbursement provided by the MAC by filing an appeal, the amount in controversy exceeds $10,000 for a single provider or $50,000 for a group, and the appeal is timely filed. *See* 42 U.S.C. § 1395oo(a). However, if the Board makes a determination under 42 C.F.R. § 405.1873 that the provider shall neither receive nor potentially qualify for reimbursement for the specific items appealed—even if the provider otherwise prevails on the merits—then the amount in controversy no longer meets the minimum jurisdictional threshold, and the Board effectively negates its necessary preliminary finding that it had jurisdiction to hear the claims.

123.    In each of the EJR Determinations touching this issue, the Board concluded that it lacked authority to declare the 2016 Regulation invalid and that EJR was appropriate. *See* **Exhibit 1** at 19; **Exhibit 2** at 19.

124.    The Secretary's attempt in § 405.1873(b)(2) and (c) to circumvent the holding in *Bethesda* and expand upon the jurisdictional prerequisites of 42 U.S.C. § 1395oo(a) is contrary to law and must be invalidated.

### COUNT V
### In the Alternative to Count IV, if the 2016 Regulation is Valid, the Secretary Erroneously Concludes that Certain Plaintiffs Did Not Submit an Appropriate Cost Report Claim.

125.    Plaintiffs reallege and reincorporate paragraphs 1–124 above as if set forth fully herein.

126.    The Board found that the three Providers subject to § 413.24(j), identified above in ¶ 115, failed to include an appropriate cost report claim for the DSH-SSI Days issue. However, the regulation requires only that the Providers claim the specific item or self-disallow it on their cost reports, and the Providers complied with this requirement by claiming on their cost reports the DSH adjustment available in accordance with Medicare policy.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order for Declaratory Judgment:

a.    declaring invalid the Secretary's construction of the term "entitled to supplemental security income benefits" with respect to the composition of the Medicare fraction;

b.    directing the Secretary to furnish the Plaintiffs with CMS data from the Social Security Administration to identify the PSC Codes of all SSI enrollees who were entitled to

Part A and who received inpatient hospital services from the Plaintiffs during the cost report years at issue;

c.    declaring invalid the Secretary's promulgation of 42 C.F.R §§ 405.1873 and 413.24(j) with respect to the substantive claim requirements for an appropriate claim for reimbursement in a cost report; or alternatively declaring erroneous the Board's findings that four Plaintiffs subject to those regulations failed to meet the requirements;

d.    directing the Secretary to recalculate all of the Plaintiffs' Medicare fractions to count all SSI Enrollee's patient days as SSI Days in the numerator of the Medicare fraction;

e.    requiring the Secretary to pay interest on the amount due to Plaintiffs pursuant to 42 U.S.C. § 1395oo(f)(2); and

f.    providing such other relief as the Court may deem proper and just.

Dated this 27th day of January, 2022.

Respectfully Submitted,

/s/ Daniel F. Miller
Daniel F. Miller, D.C. Bar No. WI0032
Sara Jean MacCarthy, D.C. Bar No. WI0037
Heather D. Mogden, D.C. Bar No. WI0039
HALL, RENDER, KILLIAN, HEATH & LYMAN, P.C.
330 East Kilbourn Avenue, Suite 1250
Milwaukee, WI 53202
Telephone:   (414) 721-0478
Facsimile:   (414) 721-0491
Email: dmiller@hallrender.com
Email: smaccarthy@hallrender.com
Email: hmogden@hallrender.com

*Attorneys for Plaintiffs*

4870-7821-0311v1